Mary B. McCord*
mbm7@georgetown.edu
Amy L. Marshak*
Annie L. Owens*
Jennifer Safstrom*
Seth Wayne*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C.  20001
Tel.:  (202) 662-9042
Fax:  (202) 662-9248

* *Admission Pro Hac Vice Pending*

Wendy J. Olson, ISB No. 7634
wendy.olson@stoel.com
Elijah M. Watkins, ISB No. 8977
elijah.watkins@stoel.com
STOEL RIVES LLP
101 S Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000
Facsimile:  208.389.9040


*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| AHNIAH SELENE; KASSIE HOWE; DISABILITY ACTION CENTER – NORTHWEST, INC.; DISABILITY RIGHTS IDAHO; LIVING INDEPENDENCE NETWORK CORPORATION IDAHO; LIFE, A CENTER FOR INDEPENDENT LIVING; INTERMOUNTAIN FAIR HOUSING COUNCIL,<br><br>                              Plaintiffs,<br><br>   v. | Case No.  1:21-cv-00021-DCN<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |

LEGISLATURE OF THE STATE OF
IDAHO,

SCOTT BEDKE, in his official capacity
as Speaker of the House of
Representatives of the State of Idaho,

CHUCK WINDER, in his official capacity
as President Pro Tempore of the Idaho
State Senate,

                        Defendants.

## INTRODUCTION

No person should have to choose between her life and exercising her constitutional rights. But that is exactly the choice Plaintiffs will face when the Idaho Legislature convenes on January 11 for the 2021 session.  Plaintiffs are disability-rights advocacy organizations, their constituents, and individuals whose disabilities make them particularly susceptible to severe complications and even death from COVID-19.  They wish to participate in the 2021 Idaho legislative session and testify regarding issues of special significance to them and their communities—issues like proposed cuts to Medicaid, a possible repeal of Medicaid expansion, and the current shortage of direct care workers—which the Idaho Legislature is set to consider this year.

But Defendants have implemented a policy for attending and participating in the legislative process that denies basic safeguards necessary to minimize the risk of transmission of COVID-19. They have also permitted unmasked, unlawful private militia groups and armed individuals to intimidate and coerce legislators and members of the public in the legislative chambers and committee rooms.  Their decision to implement plainly insufficient public health and safety protocols will prevent Plaintiffs from fully participating in the legislative process, denying them their right to advocate on issues that matter to them without unduly risking their health and safety.

Defendants' policy and practices therefore violate Plaintiffs' fundamental right to petition their government for redress of grievances under the First Amendment to the United States Constitution.  And although Plaintiffs have sought accommodations to allow them to participate safely, Defendants have denied those requests in violation of the Americans with Disabilities Act and the Rehabilitation Act.  Because the legislative session begins on January 11, urgent injunctive relief is necessary to secure Plaintiffs' rights to participate in the legislative process and speak out on important public issues in a meaningful and timely manner.

## FACTS

The Idaho State Capitol Building, which houses the Idaho Legislature, is "a public monument representing the spirit of Idaho's citizens, a symbol of Idaho's sovereignty and one of Idaho's most renowned landmarks." Idaho Code § 67-1601(a). It "is also one of the most vital and preeminent public buildings in Idaho, wherein the legislative department . . . maintain[s its] offices and perform[s its] constitutionally prescribed duties." *Id.* § 67-1601(b). Consistent with the public character of the State Capitol, the Idaho Legislature maintains "an open legislative process. All committee action on bills and amendments is conducted in open sessions and [the public] may attend any or all of these meetings."[1]

Plaintiffs are disability-rights advocacy organizations, their constituents, and individuals with disabilities who wish to participate in Idaho's open legislative process. But they are unable to exercise their fundamental rights to participate in Idaho's legislative process under the Legislature's current health and safety policies. In the 2021 session, beginning January 11, the Legislature will convene at the Capitol Building to consider issues directly affecting Plaintiffs' lives. These issues include, among others, proposed cuts to Medicaid and other crucial health services, landlord-tenant law questions, the Idaho Human Rights Act, and the availability of direct care workers, who are in short supply due to low wages and the pandemic. *See* Compl. ¶ 2. Plaintiffs, many of whom frequently observe and participate in the Idaho legislative process, wish to attend and testify at hearings and express their views on these and other important issues.

Right now, however, the country is in the midst of a pandemic involving the dangerous COVID-19 virus, which is spread easily through airborne transmission in enclosed spaces. In recent weeks, COVID-19 cases in Idaho have spiked. As of January 10, 2021, over 1,500 Idahoans

---

[1] *Testifying Before Legislative Committees*, Idaho Legislature, https://perma.cc/5T46-ZEYA.

have died.[2]  Compared to the general population, individuals with disabilities, like Plaintiffs, are more likely to suffer severe complications or die from COVID-19.[3]  For example, Plaintiff Ahniah Selene is a quadriplegic who uses a power chair for mobility, and his lung capacity is severely diminished.  Selene Decl. ¶ 4.  He also has asthma, which requires the use of inhalers, 24-hour nebulization treatment, and oxygen.  *Id.*  Plaintiff Kassie Howe's required medications make her immunocompromised, leaving her more susceptible to the virus.  Howe Decl. ¶¶ 3, 5.  She also relies on a service dog to help her manage mental illness, but her support animal cannot properly do its job if crowds refuse to adhere to social distancing rules.  *Id.* ¶ 4.  Selene, Howe, and other Plaintiffs cannot fully participate in the 2021 legislative session without precautions in place to minimize their risk of exposure to the virus.

The Idaho Legislature's current protocols governing public access to and participation in legislative business at the State Capitol, however, effectively deny Plaintiffs their right to participate in the legislative session.  Although simple public-health measures, including wearing masks and practicing social distancing, can greatly minimize the risk of exposure to COVID-19, the Legislature's current policy makes such precautions optional.  Also optional is the use of technology to allow remote testimony in committee hearings, even though the Legislature recently accepted federal funds to pay for equipment to facilitate remote participation.  *See infra* pp. 17-18.

---

[2] Idaho Official Resources for the Novel Coronavirus, https://perma.cc/4KDS-6D6A (last updated Jan. 10, 2021).

[3] *See, e.g.*, *Special considerations for people with physical disabilities during the COVID-19 pandemic*, Mayo Clinic (June 5, 2020), https://perma.cc/D3MF-JNRD ("[p]eople who use wheelchairs face increased risk of exposure to COVID-19" because "[t]heir heads are lower than those of people who are standing," making them more susceptible to falling respiratory droplets); Shaun Heasley, *People With Down Syndrome 10 Times More Likely To Die From COVID-19*, DisabilityScoop (Oct. 28, 2020), https://perma.cc/5WJM-5FNW; Joseph Shapiro, *COVID-19 Infections And Deaths Are Higher Among Those With Intellectual Disabilities*, NPR (June 9, 2020), https://perma.cc/5ZMT-2UFF (individuals with developmental disabilities are four times more likely to contract COVID-19 and twice as like to die from the virus).

Defendant Scott Bedke, as the Speaker of the Idaho House of Representatives, and Defendant Chuck Winder, as the President Pro Tempore of the Idaho Senate, control the Capitol Building space occupied by the Legislature and have authority to implement measures regarding access to and use of those portions of the Capitol.  *See* Idaho Code § 67-1602(3); Idaho House Rule 63(2) ("It is the duty of the Speaker to have general charge and supervision of the House floor, chamber, galleries, office spaces, committee rooms, adjoining and connecting hallways and passages; and to oversee decorum and preserve order therein."); Idaho Senate Rule 5 ("The Chamber, rooms, passages, and corridors of the Senate, during the legislative session, shall be under the control of the President Pro Tempore.").  Accordingly, Plaintiffs and other partner organizations have contacted Speaker Bedke and President Pro Tempore Winder twice to seek reasonable modifications to the current policy to allow Plaintiffs to participate safely and fully in the upcoming legislative session. On December 14, 2020, Plaintiffs and other partner organizations wrote to Defendants to raise these issues and request an opportunity to work together on solutions.[4]

Defendants' responses were wholly inadequate.  Speaker Bedke responded on December 21, 2020, enclosing a list of "safety precautions we have already implemented and those we continue to consider."[5]  President Pro Tempore Winder responded on December 22, 2020, asserting that "[t]he Idaho Legislature has taken a significant number of steps to protect both legislative members and the public."[6]  Both letters, however, describe policies that make basic COVID-19 precautions, like mask wearing and social distancing, optional.[7]  Although they state

---

[4] Letter to Brad Little, Governor, State of Idaho, et al. (dated Dec. 9, 2020; sent Dec. 14, 2020) (Compl. Ex. A).
[5] Letter from Scott C. Bedke, Speaker, Idaho House of Representatives (Dec. 21, 2020) & Attach. (Compl. Ex. B).
[6] Letter from Chuck Winder, President Pro Tem., Idaho Senate, (Dec. 22, 2020), (Compl. Ex. C).
[7] *See* Bedke Attach. at 1 (describing precautions that "allow for social distancing" but do not require it; making masks mandatory only for "LSO staff," but merely "available" for others);

that committee rooms are equipped with technology that would allow remote participation, they leave the actual use of such technology optional.[8]   Moreover, neither letter provides any instructions on how members of the public, like Plaintiffs, may use this technology or request to participate remotely.  The Legislature's website is similarly devoid of any such information.

On January 4, 2021, Plaintiffs sent a follow-up letter.[9]  That letter requests a modification of the Legislature's policies under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act that would allow Plaintiffs to participate fully and safely in the 2021 legislative session.  Speaker Bedke and President Pro Tempore Winder did not respond.

It now appears that the Legislature will convene using the protocols described in the Speaker's and President Pro Tempore's letters.  Those protocols, however, have already proven to be insufficient.  As Winder's letter acknowledges, these protocols are "similar to the protocols in place during the [August 2020] special session, which, at times, had some problems with enforcement."[10]   That is an understatement: Plaintiffs were effectively prevented from participating in that special session when Defendants allowed unmasked individuals to crowd the Capitol's hallways and committee rooms, repudiating social distancing and other health protocols. During that session, maskless armed spectators forced themselves into the Legislature, "shattering a glass door, rushing into the gallery that had limited seating because of the virus, and forcing

---

Winder Letter at 1 (noting that committee rooms configured for "socially distanced seating" but providing no enforcement mechanisms; omitting any mention of masks altogether).

[8] *See* Bedke Attach. at 2 (explaining that "[r]emote testimony is possible in committee rooms" but is "[s]ubject to each chamber's approval"); Winder Letter at 2 (noting that Senate committees are equipped for remote testimony without further assurances that remote access will be available).

[9] Letter from Wendy J. Olson to Scott Bedke, Speaker of the House, and Chuck Winder, President Pro Tem. of the Senate, *Re: Reasonable Accommodation Request* (Jan. 4, 2021) (Compl. Ex. D).

[10] Winder Letter at 2.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION - 5

lawmakers to ask for calm in a crowd that included a man carrying an assault-style weapon."[11] "House Speaker Scott Bedke, seeking to avoid violence, then gave the order to allow the protesters inside."[12]   Both in the "full gallery" and "packed committee rooms," they "ignored social distancing," causing one representative to leave a committee meeting "citing unsafe conditions."[13]

This chaotic, dangerous environment chilled Plaintiffs' ability to participate in the legislative process during the special session.  For example, Plaintiff Selene and the staff and volunteers of Plaintiff Intermountain Fair Housing Council ("IFHC") intended to attend the special session but did not do so because of concerns for their health and safety.  Selene Decl. ¶ 7; Olson Decl. ¶ 5.

Absent emergency injunctive relief, the Idaho Legislature will convene its 2021 session under health and safety protocols substantially similar to the inadequate policy in place during the special session.  Without immediate relief to ensure their health and safety, Plaintiffs will be unable to participate fully or safely in the legislative process and their voices will be missing in the debate on critical issues that affect them directly.

## ARGUMENT

Plaintiffs are entitled to a temporary restraining order or, in the alternative, a preliminary injunction, which are governed by identical standards.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "In either case, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving

---

[11] Keith Ridler, *Crowds shatters glass to get to Idaho House session on virus*, Associated Press (Aug. 24, 2020), https://perma.cc/G8CN-3WSR.
[12] Rebecca Boone, *Armed statehouse protests set tone for US Capitol insurgents*, Idaho Press (Jan. 7, 2021), https://perma.cc/8CT2-KJRS.
[13] Ridler, *supra* note 11.

party; and (4) that an injunction is in the public interest." *Idaho v. Coeur d'Alene Tribe*, 49 F. Supp. 3d 751, 762 (D. Idaho 2014) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Where, as here, 'the government is a party, these last two factors merge.'" *Hecox v. Little*, 2020 WL 4760138, at *24 (D. Idaho Aug. 17, 2020) (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

**I.    Plaintiffs Are Likely to Succeed on Their Claims That Defendants' Policies and Practices Violate Their Federal Constitutional and Statutory Rights**

Plaintiffs are being excluded from full and equal participation in the Idaho legislative process and denied fundamental federal rights as a result of Defendants' decision to implement policies and engage in practices that deny basic public health and safety protections. Plaintiffs are likely to prevail on their claims that Defendants' policies and practices violate the First Amendment, as well as the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq*.

**A.  Plaintiffs Have Standing**

To establish standing, a plaintiff must demonstrate "that (1) they have suffered an injury-in-fact" that is "'concrete and particularized' and 'actual and imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more than speculative' that the injury is judicially redressable." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Organizations can assert standing on behalf of their own members" or constituents, who themselves have been injured, "or in their own right." *Id.* (internal citations omitted). An organization has standing in its own right where it "establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.*

Plaintiffs easily satisfy these tests.  Because Defendants' policy and practices will effectively bar the individual and organizational Plaintiffs and their constituents from participating in the 2021 legislative session, Plaintiffs and their constituents will suffer imminent and concrete injuries to their rights protected by both the First Amendment and the ADA.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (recognizing loss of First Amendment freedoms as a cognizable harm); *Chalk v. U.S. Dist. Court C.D. Cal.*, 840 F.2d 701, 710 (9th Cir. 1988) (recognizing "emotional and psychological" injury from disability discrimination); *see also Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (concluding that a protection and advocacy organization, analogous to DisAbility Rights Idaho, had representational standing on behalf of its constituents).  Moreover, an integral part of the missions of the organizational Plaintiffs is to advocate for policies that are important to persons with disabilities.  *E.g.*, Cunningham Decl. ¶¶ 3-5; Leeper Decl. ¶¶ 3-4, 6; Maxand Decl. ¶¶ 4-6.  Their inability to do so at this legislative session has "'perceptibly impaired' their ability to perform the services they were formed to provide" and required them to expend resources on less effective ways to seek to achieve their policy goals.  *E. Bay Sanctuary*, 950 F.3d at 1266.  Finally, these injuries are fairly traceable to Defendants' policy decisions and would be redressed by a policy that adequately protects Plaintiffs' health and safety.

**B. Defendants Are Violating Plaintiffs' First Amendment Right to Petition Their Government for Redress of Grievances**

The First Amendment to the United States Constitution protects individuals' right "to petition the Government for a redress of grievances."  U.S. Const. amend. I; *see De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (right to petition incorporated through the Fourteenth Amendment).  This guarantee is "one of 'the most precious of the liberties safeguarded by the Bill of Rights,'" *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967)), and is rooted in principles

that "long antedate the Constitution," *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  Indeed, "[t]he very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

The right to petition is inextricably bound with the First Amendment's other guarantees, including the freedoms of speech and assembly, and acts as "an assurance of a particular freedom of expression." *McDonald*, 472 U.S. at 482; *see also Thomas v. Collins*, 323 U.S. 516, 530 (1945) (explaining that the First Amendment's freedoms are "cognate rights").  Accordingly, the right to petition "cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions." *De Jonge*, 299 U.S. at 364.

Because of the fundamental nature of the right to petition—and because a burden on that right is also a burden on "core political speech"—state-imposed restrictions are subject to strict scrutiny.  *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988).  This analysis applies equally to "indirect restraints" on First Amendment activity, such as policies that have the effect of limiting the right to petition or speech.  *United Mine Workers*, 389 U.S. at 222 ("The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such.").  Courts will therefore uphold such a restriction "only if it is narrowly tailored to serve an overriding state interest."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995); *see also, e.g.*, *Meyer*, 486 U.S. at 420-25.

Here, Plaintiffs wish to attend legislative sessions, speak to their legislators about important issues including access to Medicaid and related services, and testify in committee hearings about pending legislation.  The outcome of public debate on these issues will profoundly affect Plaintiffs'

lives, including their ability to obtain affordable health care and other necessary aid and services. This sort of political advocacy on timely policy issues falls within the core of the First Amendment's protections of the rights to petition and political expression. *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) ("peaceably express[ing] . . . grievances" to legislative bodies is "an exercise of these basic constitutional rights in their most pristine and classic form").

Defendants have created a barrier to Plaintiffs' participation in the Idaho legislative process, thus infringing on Plaintiffs' fundamental rights, by implementing a policy that requires Plaintiffs to put their health and lives at risk in order to exercise those rights. A global pandemic is raging, and Plaintiffs' disabilities put them at especially high risk of complications or death from COVID-19; they cannot safely participate in the legislative session without protocols to minimize their risk of exposure to the virus. But Defendants have chosen to implement and enforce a policy that denies basic protections for the health and safety of persons wishing to attend, observe, and participate in the Idaho Legislature's proceedings. Defendants' policy makes optional for both legislators and members of the public even the most basic health precautions, such as wearing masks and practicing social distancing. In addition, it does not provide an automatic option for members of the public, including Plaintiffs, to use technology to testify remotely before legislative committees. Although the technology is available, Defendants' policy leaves its use up to committee chairs and provides no information regarding how to participate remotely or request to participate remotely. It also provides no guarantee that remote testimony, even if offered, would be afforded the same access, weight, and consideration as in-person testimony. Defendants' policy thus leaves Plaintiffs with an impossible and unconstitutional choice: their health or their rights.

This barrier to Plaintiffs' ability to exercise their core First Amendment rights cannot withstand strict scrutiny. Defendants have no government interest—much less a compelling one—

in maintaining insufficient health and safety protocols that put Plaintiffs at risk.  Even assuming Defendants could identify an interest in such a policy, it is not narrowly tailored because it eliminates a wide swath of individuals' speech and their ability to petition their government on critical political issues of public importance.  Such a sweeping exclusion of individuals wishing to engage in a public debate on issues of public concern cannot stand.  *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429, 438 (1963) ("[T]he First Amendment . . . protects vigorous advocacy, certainly of lawful ends, against governmental intrusion."); *cf. City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175-76 (1976) ("To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees.").

### C.  Defendants Are Violating Plaintiffs' Rights Under the ADA and the Rehabilitation Act

Defendants' decision to implement policies and engage in practices that deny Plaintiffs basic public health and safety protections also violates the ADA and the Rehabilitation Act.

### 1.  Defendants Are Violating Plaintiffs' Rights Under the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132.  Plaintiffs satisfy each element of a Title II claim: (1) they, their staff, or their constituents are "individual[s] with a disability;" (2) they are "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) they have been "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination [is] by reason of" their disabilities.  *McGary*

*v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).  The ADA therefore requires Defendants to "make reasonable modifications in policies, practices, or procedures" to ensure that Plaintiffs can safely and fully participate in the legislative process.  28 C.F.R. § 35.130(b)(7).

### a.  Plaintiffs Comprise Individuals with a Qualifying Disability

Plaintiffs are individuals with a disability, organizations comprising individuals with disabilities within the meaning of the ADA, and organizations that represent individuals with disabilities within the meaning of the ADA who require modifications to Defendants' policies and practices because their disabilities make them more susceptible to severe consequences or death from COVID-19.  The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A), (2)(A); *see also id*. § 12102(4)(A) (disability "shall be construed in favor of broad coverage").  Plaintiffs or their constituents have disabilities that meet this definition, including quadriplegia, ulcerative colitis, post-traumatic stress disorder ("PTSD"), dissociative identity disorder ("DID"), and Major Depressive Disorder ("MDD").  Selene Decl. ¶ 4; Howe Decl. ¶ 3, 5; *see, e.g.*, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004) (quadriplegia); *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 105 (1st Cir. 2007) (ulcerative colitis); *C.L. v. Del Amo Hosp.*, 2019 WL 4187848, at *1 (C.D. Cal. Sept. 3, 2019) (PTSD, DID); *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) (MDD).

Courts have held that, where individuals seek reasonable modifications based on the effects of COVID-19, "the proper way to make the disability determination" is to consider a plaintiff's condition "in light of the pandemic's existence."  *Silver v. City of Alexandria*, 470 F. Supp.3d 616, 622 (W.D. La. 2020); *Valentine v. Collier*, 4:20-CV-1115, at *3 (S.D. Tex. Jun. 27, 2020); *cf.* U.S. Equal Employment Opportunity Commission, *Pandemic Preparedness in the Workplace and the*

*Americans with Disabilities Act* (Mar. 21, 2020), https://perma.cc/DS7F-4J9A ("[T]he ADA requires reasonable accommodations for individuals with disabilities . . . during a pandemic."). This means specifically considering whether Plaintiffs are "at higher risk for serious illness or even death if they contract COVID-19." *Peeples v. Clinical Support Options, Inc.*, 2020 WL 5542719, at *3 (D. Mass. Sept. 16, 2020).

Plaintiffs' and their constituents' disabilities make them more susceptible to severe illness or death from COVID-19.  For example, Plaintiff Selene is at increased risk due to his diminished lung capacity, as is Plaintiff Howe because she is immunocompromised.   Moreover, the constituents, staff, boards of directors, and leadership of Plaintiffs Disability Action Center – Northwest, Inc., DisAbility Rights Idaho, Living Independence Network Corporation Idaho, Life—A Center for Independent Living, and IFHC also include individuals with these and other disabilities, including persons who suffer from respiratory, mobility, or mental health difficulties. The CDC has made clear that people with such disabilities and associated chronic illnesses, especially "chronic lung disease, a serious heart condition, or a weakened immune system," are likely to "be at a higher risk of infection or severe illness" due to COVID-19.[14]  Similarly, people with cancer, Type 2 diabetes, or Down Syndrome, among other conditions, have an "increased risk of severe illness."[15]

### b.  Plaintiffs Are Otherwise Qualified to Participate in the Legislative Session

Plaintiffs are "otherwise qualified" to participate in a "public entity's" "services, programs, or activities."  As an initial matter, Defendant Idaho State Legislature is a "public entity" under the ADA, and this Court may grant injunctive relief against Defendants Bedke and Winder in their

---

[14] CDC, *People with Disabilities*, https://perma.cc/459R-Y3LQ.
[15] CDC, *People with Certain Medical Conditions*, Centers for Disease Control & Prevention, https://perma.cc/U7NQ-M9D9.

official capacities as officers of that public entity under *Ex parte Young*, 209 U.S. 123 (1908). *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 (1999) ("'public entity' includes 'any State or local government'"); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1188 (9th Cir. 2003) (ADA Title II claims against individual defendants for injunctive relief "against state officials in their official capacities"); *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763 (11th Cir. 2020) (ADA claim against the Florida Senate, House of Representatives, and leadership).

The Idaho legislative process is a "service, program, or activity" under the ADA. "Rather than determining whether each function of a [public entity] can be characterized as a service, program, or activity for purposes of Title II," the Ninth Circuit has "construed the ADA's broad language," as well as similar language in the Rehabilitation Act, "[as] bring[ing] within its scope anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotation marks omitted; alterations in original).

Finally, Plaintiffs are "otherwise qualified" to participate in the legislative session. The Idaho Legislature maintains "an open legislative process" and invites public participation.[16] Individuals with disabilities are entitled to the same opportunity as all other citizens to participate fully in that process. Participating in the legislative process, like voting and other hallmark acts of democratic citizenship, is a "quintessential public activity." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).

### c. Plaintiffs Are Excluded from Participating in the Legislative Process

Defendants' policy and practice of denying basic health and safety protections exclude Plaintiffs from participating in the legislative process. It is well established that physical barriers that prevent access by people with disabilities to a service, program, or activity impermissibly

---

[16] *Testifying Before Legislative Committees*, Idaho Legislature, https://perma.cc/5T46-ZEYA.

exclude those individuals.  *See Barden*, 292 F.3d at 1076; 28 C.F.R. § 35.149.  But "[p]hysical barriers are not the only means by which to impede accessibility."  *People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179, 1220 (N.D. Ala. 2020).  Here, Defendants' inadequate health and safety policies have created a barrier to Plaintiffs' participation in the legislative process by requiring Plaintiffs to risk severe illness or death in order to participate.  Courts that have considered a similar issue in the voting context "have found that requiring a voter to risk her health by foregoing social distancing guidelines presents a 'nearly insurmountable hurdle.'"  *Id.* (quoting *Libertarian Party of Illinois v. Pritzker*, 455 F.Supp.3d 738, 744 (N.D. Ill. April 23, 2020)); *see id.* at 1221 ("[T]he plaintiffs are presented with the option of braving exposure to an illness from which they are at high risk of severe complications or dying, or foregoing their right to vote.  To the extent that the plaintiffs' trepidation to risk their health is a choice, it is not a meaningful one.").

### d.  Plaintiffs Are Excluded by Reason of Their Disabilities

Finally, Defendants' inadequate health and safety policies and practices have excluded Plaintiffs from participating in the legislative process by reason of their disabilities.  Whether Defendants *intend* to discriminate against Plaintiffs is irrelevant under the ADA.  As the Ninth Circuit has explained, "facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced."  *McGary*, 386 F.3d at 1265.  The key question is "whether disabled persons [are] denied 'meaningful access' to state-provided services," not whether the discrimination is "either 'deliberate' or 'disparate impact.'"  *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (internal citation omitted).  It is enough that Defendants' policies and practices disproportionately burden people with disabilities and deny them meaningful access to the legislative session.  *See id.* (finding an animal quarantine requirement discriminatory where it "burden[ed] visually-impaired persons in a manner different

and greater than . . . others"); *People First of Alabama*, 467 F. Supp. 3d at 1221 (explaining, in the voting context, that "[d]emanding that the plaintiffs expose themselves to COVID-19 when they otherwise would not impedes their ability to readily access the state's . . . program").

"[T]he ADA's regulations mandate reasonable modifications" to such practices or policies that "discriminate against the disabled in violation of the ADA[.]" *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003). Here, Defendants have refused to provide reasonable modifications to remedy that discrimination. Specifically, Plaintiffs requested that the Legislature implement public health and safety measures to allow in-person participation and provide an option to observe and testify remotely. *See* Compl. Ex. D. Defendants have done neither. Their current policies make face masks and social distancing optional, rendering in-person participation too unsafe. And although the Legislature's existing technology allows for remote participation, its use is not required—nor have Plaintiffs received any assurance that, if remote participation is permitted, remote testimony will be given the same weight and consideration as in-person testimony. The ADA requires more: Defendants are not permitted to rely on a "facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *McGary*, 386 F.3d at 1267.

Moreover, Defendants have given no reason for refusing these modifications. Although reasonable modifications are not required if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i), Defendants have not argued this exception applies here. At any rate, neither imposing additional public health precautions nor mandating remote access would materially affect the lawmaking process. Instead, such modifications would ensure that the democratic process functions as intended by enabling Plaintiffs and others to have a meaningful opportunity to observe and take part in the Legislature's activities without imperiling their health.

Furthermore, budget concerns should not prevent Defendants from requiring access via remote technology because, as discussed below, Defendants have received federal funds to pay for such technology.   Regardless, "budgetary concerns do not alone sustain a fundamental alteration defense." *M.R. v. Dreyfus*, 697 F.3d 706, 736 (9th Cir. 2012).

Defendants' obligation under the ADA is clear.   Although courts are "mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures," "when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved." *Crowder*, 81 F.3d 1480, 1485.

## 2.   Defendants Are Violating Plaintiffs' Rights Under the Rehabilitation Act

For similar reasons, Defendants are also violating Section 504 of the Rehabilitation Act, which, like the ADA, prohibits the exclusion of an "otherwise qualified individual with a disability, . . . solely by reason of her or his disability," from "participation in . . . any program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a).

Defendants are recipients of federal financial assistance, and thus are subject to Section 504's requirements.   The Legislature recently received $1,256,134 in federal funds under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020).[17]   These funds were requested "for Statehouse audio/visual improvements and related technology upgrades to provide for remote and social distancing legislative work" during the pandemic.[18]   As Speaker Bedke explained, the funds were "critical to help ensure the Legislature has the necessary technology in

---

[17]  *See* Compl. ¶ 38; CRF Entity Allocations, Transparent Idaho (Dec. 16, 2020), https://perma.cc/RA33-9J6T.

[18]  Letter from Eric Milstead, Director, Legislative Services Office, Idaho State Legislature to Coronavirus Financial Advisory Committee (July 7, 2020), https://perma.cc/G4MG-D8BV.

place to revise how it conducts its business during this pandemic," and "[m]ost, if not all, of the upgrades will be utilized during the 2021 legislative session."[19]

The Ninth Circuit has recognized that the protections provided by the ADA and Rehabilitation Act are coextensive. *See, e.g.*, *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) ("Congress has instructed that the ADA is to be interpreted consistently with the Rehabilitation Act."). Accordingly, for the same reasons that Plaintiffs are entitled to reasonable modifications under the ADA, Plaintiffs are entitled to similar relief under the Rehabilitation Act. *See Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 747 (C.D. Cal. 2020) ("persons with health conditions putting them at risk of severe illness or death if exposed to COVID-19" are persons with disabilities under Section 504).

## II.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief

Absent injunctive relief, Plaintiffs will suffer irreparable harm because they will be unable to participate in the 2021 legislative session and petition their government on issues important to them, including access to Medicaid and other critical healthcare services. The Supreme Court and the Ninth Circuit have both made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Klein*, 584 F.3d at 1207-08.

In fact, "[t]he harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and [a] delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (internal quotation marks omitted; alteration in original). This harm is compounded given that the issues on which Plaintiffs wish to speak implicate their

---

[19] *Id.* (Letter from Scott Bedke, Speaker, House of Representatives, State of Idaho, to Alex Adams, Chairman, Coronavirus Financial Advisory Committee, State of Idaho (July 8, 2020)).

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION - 18

own access to critical health care services such as Medicaid. The 2021 legislative session begins on January 11, and the Joint Finance-Appropriations Committee, which likely will consider many of these issues, is scheduled to begin hearings on January 12. Plaintiffs require urgent injunctive relief to allow them to participate in the 2021 legislative session; otherwise, their ability to petition their government on these issues in a timely and meaningful manner will be irreparably lost.

Furthermore, courts have recognized that disability discrimination results in irreparable harm due to "the consequent emotional stress, depression and reduced sense of well-being, which constitute[s] psychological and physiological distress . . . the very type of injury Congress sought to avert" in passing the ADA. *Chalk*, 840 F.2d at 709 (internal quotation marks omitted).

## III. The Balance of Equities Tips in Plaintiffs' Favor, and Injunctive Relief Serves the Public Interest

Plaintiffs also prevail on the remaining two factors: The balance of equities tips in their favor, and injunctive relief is in the public interest. The irreparable injuries described above are severe and immediate. Those injuries far outweigh any marginal burden on Defendants that might result from injunctive relief prohibiting them from denying Plaintiffs' rights.

Moreover, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citation omitted). More specifically, courts have recognized a "significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court, in & for Cty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002). In addition, "[e]nsuring that disabled individuals are afforded an opportunity to participate in" the democratic process helps assure that they "are never relegated to a position of political powerlessness," a principle central to Congress's enactment of disability antidiscrimination laws. *Nat'l Fed'n of the Blind*, 813 F.3d at 507.

Above all, the public interest inquiry is concerned with the impact on the public at large. *Sammartano*, 303 F.3d at 974-75.  Injunctive relief that would allow Plaintiffs to participate in the legislative process would enrich the public debate over important issues pending before the Legislature.  The Supreme Court has long recognized that "[d]iscussion of public issues" is "integral to the operation of the system of government established by our Constitution" and that the "unfettered interchange of ideas for the bringing about of political and social changes" strengthens the political process. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).  As Judge Learned Hand explained, "the First Amendment . . . presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943); *see New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (describing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

Finally, COVID-19 cases are spiking in Idaho and across the country and people are dying in record numbers, especially as a new and highly contagious strain of the virus has recently been found in the United States.[20]  Reasonable public health and safety protocols would benefit not only Plaintiffs, but all Idahoans who wish to participate in the legislative process without exposing themselves to undue risk.  Accordingly, injunctive relief is decidedly in the public interest.

## CONCLUSION

For all of the foregoing reasons, this Court should grant Plaintiffs' Motion for a Temporary Restraining Order or, in the Alternative, a Preliminary Injunction.

---

[20] *See* Nicholas Reimann, '*Close To A Worst-Case Scenario'—Former CDC Director Issues 'Horrifying' Outlook For New Covid Strain*, Forbes (Jan. 8, 2021), https://perma.cc/UW4X-DQ8G.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION - 20

DATED:  January 11, 2021.

STOEL RIVES LLP

 /s/ Wendy J. Olson
Wendy J. Olson
Elijah M. Watkins

Attorneys for Plaintiffs