UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AHNIAH SELENE; KASSIE HOWE; DISABILITY ACTION CENTER – NORTHWEST, INC.; DISABILITY RIGHTS IDAHO, INC.; LIVING INDEPENDENCE NETWORK CORPORATION IDAHO; LIFE, A CENTER FOR INDEPENDENT LIVING; and INTERMOUNTAIN FAIR HOUSING COUNCIL,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE LEGISLATURE OF THE STATE OF IDAHO, SCOTT BEDKE in his official capacity as Speaker of the House of Representatives, and CHUCK WINDER in his official capacity as President Pro Tempore of the Senate,<br><br>        Defendants. | Case No. 1:21-cv-00021-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

This case involves important legal issues related to disability rights, the COVID-19 pandemic, and the format of the ongoing 2021 Idaho State legislative session. Plaintiffs contend that Defendants, by not providing better protective measures for the legislative session, have violated three federal laws: (1) the Petition Clause of the First Amendment to the United States Constitution, (2) Title II of the Americans with Disabilities Act ("ADA"), and (3) the Rehabilitation Act of 1973. Plaintiffs seek one of two

accommodations under these laws. They ask that either the in-person measures to prevent the spread of COVID-19 be increased or that they be allowed to participate remotely. Defendants counter that the in-person protective measures are reasonable and that Plaintiffs already have virtual access because they can submit written comments to be considered by the committees of each legislative session. More importantly, Defendants represent that Plaintiffs need only make specific requests to participate remotely and their requests will be approved.

The matter before the Court today is not an adjudication on the merits; rather, Plaintiffs ask the Court to preliminarily enjoin Defendants to provide the accommodations they seek in the form of a temporary restraining order ("TRO"). Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). While Plaintiffs may ultimately prevail upon a full adjudication of the merits of their claims, at this time they have not shown a sufficient likelihood of success on the merits or a sufficient likelihood of irreparable harm for this Court to grant their extraordinary, emergency requested relief. Accordingly, the Court DENIES Plaintiffs' Motion for a TRO. Dkt. 2.[1]

---

[1] The Court notes its order in a comparable case filed by two Idaho legislators on related issues. *Chew v. Legislature of the State of Idaho*, No. 1:21-cv-00014-DCN, 2021 WL 112146 (D. Idaho Jan. 12, 2021).

MEMORANDUM DECISION AND ORDER - 2

## II. BACKGROUND

Plaintiffs are organizations that advocate for disability rights, their constituents, and individuals who allege they have disabilities that make them particularly susceptible to severe complications and even death from COVID-19. Plaintiffs suffer from a range of disabling conditions, including quadriplegia, ulcerative colitis, post-traumatic stress disorder, and major depressive disorder. Defendants are the Speaker of the Idaho House of Representatives Scott Bedke (Speaker Bedke), President Pro Tempore of the Idaho Senate Chuck Winder ("Pro Tem Winder"), and the Legislature of the State of Idaho (collectively "the Legislature").

In early December 2020, the Idaho House of Representatives and the Idaho Senate established their respective rules for the 2021 legislative session. As is relevant to this case, the Idaho House of Representatives adopted House Rule 63, which places a duty to supervise various spaces throughout the Idaho Capitol on Speaker Bedke. The House also established House Rule 75, which states that the "rules of parliamentary practice set forth in Mason's Manual of Legislative Procedures shall govern the House in all cases to which they are applicable." Dkt. 18, at 10. Rule 11 of that Manual provides committee chairs with the duty of overseeing committee hearings and meetings. As for the Idaho Senate, it established Senate Rule 5 which placed control of various spaces throughout the Idaho Capitol Building in the hands of Pro Tem Winder. Senate Rule 20(D) states that "any person may attend any hearing of such committee, but may participate in the committee only with the approval of the committee itself." Senate Rule 48 is a corollary to House Rule 75. It also incorporates the rules of parliamentary practice and procedure as set forth in

Mason's Manual of Legislative Procedure in Senate proceedings.

In mid-December, the parties commenced to exchange letters on the topic of this lawsuit. On December 14, 2020, Plaintiffs wrote to the Legislature to raise health and safety issues and to request an opportunity to work together on solutions. Speaker Bedke responded on December 21, 2020, enclosing a list of "safety precautions we have already implemented and those we continue to consider." Dkt. 2, at 6. The next day, Pro Tem Winder responded to Plaintiffs' correspondence, describing the Senate's protocols to ensure that members of the public could enjoy remote and in-person access to the legislative process, stating that "[t]he Idaho Legislature has taken a significant number of steps to protect both legislative members and the public," and explaining the measures taken. *Id.* On January 4, 2021, Plaintiffs sent a follow-up letter. In it, they requested a modification of the Legislature's policies under Title II of the ADA and Section 504 of the Rehabilitation Act that would allow Plaintiffs to participate fully and safely in the 2021 legislative session. They sought either of the two accommodations that they seek in this lawsuit. Speaker Bedke and Pro Tem Winder both began considering the letter and working on the issues raised in the letter.

Before the Legislature sent a response, Plaintiffs filed this lawsuit and moved for a TRO on the afternoon of January 11, 2021. Dkts. 1, 2. In their motion, Plaintiffs explain that they wish to participate in the 2021 Idaho legislative session and testify regarding issues of special significance to them and their communities. Dkt. 2. They contend that Defendants have implemented a policy for attending and participating in the legislative process that denies basic safeguards necessary to minimize the risk of transmission of

COVID-19, thereby violating their fundamental right to petition the government for redress of grievances under the First Amendment and their rights to access a public service under Title II of the ADA and provisions of the Rehabilitation Act. 42 U.S.C. § 12101, *et seq.* (ADA); 29 U.S.C. §§ 701, *et seq.* (Rehabilitation Act).

That same day, legislators convened at the Idaho Capitol where the Idaho state legislative session began. The next morning, the Legislature entered a notice that it intended to oppose Plaintiffs' requested TRO. Dkt. 15. The Legislature filed its Response in which it opposes the TRO on the merits. Dkt. 18. The Legislature also contends that Plaintiffs do not have standing, that all three Defendants are entitled to legislative immunity, and that principles of federalism and separation of powers preclude the Court from providing the requested relief. *See generally id.* Plaintiffs quickly filed their Reply in the afternoon the next day. Dkt. 20. The matter is now ripe for adjudication.

### III. LEGAL STANDARD

A plaintiff seeking a preliminary injunction or a TRO must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his or her favor, and (4) that an injunction is in the public interest. *E.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1114 (9th Cir. 2017); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction and a TRO generally serve the same purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1200 (9th Cir. 1980); *see also* Fed.

R. Civ. P. 65.

Nevertheless, certain circumstances warrant divergence from the status quo. Preliminary relief may take one of two forms: (1) prohibitory, which as the name indicates, prohibits "a party from taking action and preserves the status quo pending a determination of the action on the merits" and (2) mandatory which "orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma BmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (cleaned up).[2] "A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored." *Id.* (cleaned up). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (cleaned up).

A key difference between a TRO and a preliminary injunction is the respective duration. A TRO typically does not last for more than 28 days without good cause, while a preliminary injunction may extend until the end of the lawsuit, which could be months, if not years. *NAVEX Global, Inc. v. Stockwell*, No. 1:19-cv-00382-DCN, 2019 WL 5654988, at *1 (D. Idaho Oct. 31, 2019) (citing *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 n. 1 (D. Or. 2018)). It is well-established that whether a preliminary

---

[2] The parenthetical "cleaned up," while perhaps unfamiliar to some, is being used with increasing frequency to indicate that brackets, ellipses, footnote reference numbers, internal quotation marks, alterations, and/or citations have been omitted from a quotation. For an example of its use in a published opinion, see *Lu v. United* States, 921 F.3d 850, 860 (9th Cir. 2019), or *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). For a more thorough discussion regarding the practicality of the parenthetical, see Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (2017). The parenthetical has been used in all the nation's circuit courts.

MEMORANDUM DECISION AND ORDER - 6

injunction or a TRO should be issued is committed to the sound discretion of the district court. *Jimenez v. Barber*, 252 F.2d 550, 554 (9th Cir. 1958).

## IV. ANALYSIS

The parties raise various issues in this matter. The first issue is whether Plaintiffs have standing to bring this lawsuit. The second issue is whether Defendants are entitled to legislative immunity from this action. The third question is whether the precepts of federalism and separation of powers preclude the Court from affording the requested relief in this case. The final issue is whether Plaintiffs have established the TRO factors in this case. Because all the issues have been fully briefed by both sides, the Court will address each in turn.

However, a preliminary comment is in order. What Plaintiffs seek here is a mandatory TRO because the status quo is for the legislative session to proceed without the accommodations sought.[3] *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879. Plaintiffs resist this conclusion and argue that the status quo is not the way the legislative session is currently proceeding, but "equal participation for all." Dkt. 20, at 3. This argument is wholly without merit. "[T]he status quo . . . means the last, uncontested status which preceded the pending controversy." *Id.* (cleaned up). Here, that is precisely the situation without the requested TRO. Legislative sessions in Idaho have not historically included the accommodations sought, and this one also did not before this lawsuit began. Additionally,

---

[3] "Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards" and may be used interchangeably. *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004). The Court does so in this Order.

a TRO would compel Defendants to take affirmative steps to implement the accommodations sought (mandatory), rather than enjoin them from doing something (prohibitory). Plaintiffs resist this conclusion because it means they have an even more onerous burden, as explained above. Nevertheless, they have that heightened burden, and the Court ultimately concludes it is a burden they have not met. While the Court agrees with Plaintiffs on the first three issues—standing, legislative immunity, and federalism and separation of powers—Plaintiffs have not made an adequate showing on the TRO factors to justify their request.

### A. Standing

To establish standing, plaintiffs must demonstrate that "(1) they have suffered an injury-in-fact" that is "'concrete and particularized' and 'actual and imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more than speculative' that the injury is judicially redressable." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Organizations can assert standing on behalf of their own members" or constituents, who themselves have been injured, "or in their own right." *Id.* (internal citations omitted). An organization has standing in its own right where it "establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.*

Here, Plaintiffs have shown that they have standing. They claim that the Legislature is currently harming them by preventing them from participating in the legislative session, that the harm is traceable to the Legislature because it chose what accommodations to

MEMORANDUM DECISION AND ORDER - 8

implement, and that this Court can redress the injury by holding the Legislature accountable under the First Amendment, the ADA, and the Rehabilitation Act. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1041 (9th Cir. 2008). The Court concludes that this is enough to meet the standing elements.

Nevertheless, the Legislature contends that none of the elements of standing are met. The Legislature first argues that the injury is speculative because Plaintiffs may or may not contract COVID-19 if they attend the legislative session. The Legislature asserts there have been no infections traceable to the Capitol, all staff undergo tests, and there is no evidence that anyone in the Legislature or otherwise in attendance at the Capitol has or will have COVID-19. They further point out that, with the accommodations being provided, it becomes more speculative that they are at a risk of exposure.

This argument is somewhat compelling, but the Court finds Plaintiffs' evidence regarding high COVID-19 contagious rates and the higher risk of harm to people with disabilities rebuts these arguments. Dkt. 2, at 2–3; Dkt. 20, at 4. Moreover, as an update during the pendency of this matter, a legislative attaché tested positive for COVID-19; however, it is unclear whether that attaché had been in the Capitol with COVID-19. Dkt. 21. More importantly, the possibility of contracting COVID-19 is only half the impetus for the claimed injury. The other half—the half that more clearly provides standing in this case—is Plaintiffs' conception that they could contract COVID-19 and because of that possibility they do not have access to the legislative session, which is in fact what presently

MEMORANDUM DECISION AND ORDER - 9

harms them as people with disabled conditions.[4] Put differently, under the circumstances, Plaintiffs do not speculate that the accommodations might be unreasonable, they maintain that they are so insufficient that they cannot exercise their rights without fear of physical peril. Although their claim may ultimately be unmeritorious, it suffices to establish standing in this case.

Speaker Bedke and Pro Tem Winder then argue that the alleged harmful conduct cannot be fairly traced to them because each of them alone lacks the authority to redress the injury since they have only one vote and the vote on the accommodations was put to the House and Senate with all their respective members. Plus, they say that committee chairs have discretion to control accommodations under the legislative rules. This argument is unconvincing. First, the Legislature enacted these legislative rules and decided on the accommodations. Thus, the allegedly harmful conduct is fairly traceable to all three Defendants and the roles they played. And, under order of the Court pursuant to federal law, the Legislature as a whole can and must comply, meaning that the alleged harm is redressable. Plaintiffs have standing in this case.

### B. Legislative Immunity

Defendants next attempt to invoke legislative immunity as a defense to this lawsuit. They argue that they have legislative immunity because they were acting in their legislative

---

[4] Plaintiffs assert that their injury is not exposure to COVID-19, but the lack of access to the legislative session. Dkt. 20, at 3–4. Again, this is only half true because without the risk of exposure to COVID-19, they would not have a claim. The claim at hand seems to be a combination of the health risks of COVID-19 and a purported lack of access to the legislative session based on the accommodations provided. The Legislature focuses too much on the risk of exposure to COVID-19, and Plaintiffs neglect the role COVID-19's health risks play in their claim.

function to set up the legislative session's rules. For their part, Plaintiffs argue that the conduct is administrative or executive, not legislative, because it relates to access to the building rather than votes, statements, or policies up for legislative debate. The Court agrees with Plaintiffs.

"Local government officials are entitled to legislative immunity for their legislative actions," which "extends both to claims for damages and claims for injunctive relief." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 959 (9th Cir. 2010). Legislative immunity "attaches only to actions taken in the sphere of legitimate legislative activity," however, not administrative or executive actions. *Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003) (cleaned up). "Whether an act is legislative turns on the nature of the act," and the burden of proof is on the individual asserting that legislative immunity applies. *Id.* (cleaned up). Courts consider "four factors in determining whether an act is legislative in its character and effect: (1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation." *E.g.*, *Cmty. House, Inc.*, 623 F.3d at 960 (cleaned up).

Here, because the decision to accommodate Plaintiffs as requested does not involve a legislative act, legislative immunity does not apply. The first factor indicates that the accommodations provided are not legislative because they are not a policy, but are an ad hoc approach meant to deal with the ongoing effects of this unique global pandemic in this unique legislative situation. *See id.* at 961. True, the second factor tilts the scale slightly

toward the accommodations being legislative because they affect the public at large. After all, anyone in attendance or wanting to attend will be affected by the protective measures. However, the second factor stands alone.

The third and fourth factors also indicate that the accommodations are not legislative. Indeed, as the Legislature itself points out, the accommodation decisions are Speaker Bedke's, Pro Tem Winder's, and those of the committee chairs to make as they administrate committee and other legislative meetings. They are not open to vote, debate, and do not otherwise carry legislative character or any of the hallmarks of traditional legislation. The Court agrees with Plaintiffs that the accommodations relate to administration of portions of the Idaho Capitol building and that providing outright immunity would be an impermissible result undercutting the very purposes of the Petition Clause, the ADA, and the Rehabilitation Act. To the Legislature's point, adopting the rules that place administration of the legislative session accommodations in these individuals' hands may have been a legislative act, but how those individuals in fact administrate is not. *See McCarthy v. Pelosi*, No. 20-1395 (RC), 2020 WL 4530611, at *8 (D.D.C. Aug. 6, 2020) ("If rules controlling access to the press galleries are an integral part of the legislative machinery, rules controlling how Members vote are even more so." (cleaned up)).[5]

Simply put, the arguments for legislative immunity have not been convincing. Determining what accommodations are provided in this context is not a legislative act, and

---

[5] Of course, placing each particular decision related to accommodations to a legislative debate and vote, might present a different scenario regarding legislative immunity for Speaker Bedke and Pro Tem Winder. However, those are not the facts before the Court.

the legislative immunity doctrine is inapplicable.

### C. Federalism and Separation of Powers

The Legislature next contends that granting the requested relief would "unilaterally remove power that was lawfully granted" to Defendants by Article III, § 9 of the Idaho Constitution, which empowers the House and Senate to "determine [their] own rules of proceeding." Dkt. 18, at 15. The Legislature asserts that the rules governing the 2021 legislative session represent the will of the people of Idaho. Ordering Defendants to accommodate Plaintiffs as they request would usurp the people's power and be contrary to the Idaho Constitution. Defendants conclude that changes to legislative rules would impinge on fundamental concepts of federalism—federal intrusion on a State issue—and separation of powers—judicial intrusion on a legislative issue—and rule changes "must be left to the legislative branch to resolve." *Id.* at 16.

The Legislature's argument is unpersuasive. First, it is not the legislative rules that Plaintiffs seek to alter. Rather, it is how Speaker Bedke, Pro Tem Winder, and the committee chairs determine to administrate their respective meetings. While it is true the legislative rules empower them to do so, the House and Senate Rules do not dictate the discrete decisions. Thus, the Legislature's argument is factually misplaced.

Second, the federal laws under which Plaintiffs proceed are also the will of the people. In fact, they are a more supreme will of the people, as the U.S. Constitution makes clear through the Supremacy Clause since they are federal laws. U.S. Const. art. VI, cl. 2. Access to the legislative session calls directly into question the Petition Clause of the First Amendment and the disability rights laws, specifically Title II of the ADA. Indeed, the

Petition Clause relates to individuals' abilities to access and address grievances to the government. And Title II specifically relates to public services, which legislative sessions indisputably are. *See Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (stating that "the ADA's broad language" brings "within its scope anything a public entity does" and collecting cases in accord). And the will of the people is not incompatible here. The people of Idaho have given authority to their representatives to conduct the legislative session, but that does not mean that they have given free rein to their representatives to violate federal law.

Additionally, to the extent state governmental actions run afoul of federal law, they can be held unlawful by federal courts. *McCulloch v. Maryland*, 17 U.S. 316 (1819); *Ex Parte Yong*, 209 U.S. 123 (1908). Thus, the Legislature's administration of the legislative session must yield to federal law inasmuch as federal law requires certain accommodations. Doing so does not offend notions of federalism and separation of powers. Rather, it allows the judiciary to see that the people receive the rights afforded to them by the law and to demand the Legislature's fealty to our nation's laws. Such is not an overreach on the Court's part, but holds true to separation-of-powers first principles. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. . . . If two laws conflict with each other, the courts must decide on the operation of each.").

An analogous case shows this principle in action in the ADA context. In *Crowder v. Kitagawa*, the State of Hawaii, pursuant to a Department of Agriculture regulation, imposed a quarantine on all dogs, cats, and other carnivorous animals entering the state to

MEMORANDUM DECISION AND ORDER - 14

prevent the spread of rabies. 81 F.3d 1480, 1481 (9th Cir. 1996). This policy had a disparate impact on visually impaired individuals who relied on guide dogs, "effectively den[ying] these persons . . . meaningful access to state services, programs, and activities while such services, programs, and activities remain[ed] open and easily accessible by others." *Id.* at 1485. The court made clear that federal courts have the obligation under the ADA and accompanying regulations "to ensure that the decision reached by the state authority is appropriate under the law and in light of proposed alternatives." *Id.* Ultimately, the Ninth Circuit reversed a summary judgment that was entered for the state of Hawaii and remanded the case to the district court to determine whether the regulation's requirements were reasonable under the ADA.

This case teaches that a state regulation, similar to administrative decisions regarding session format rules, can be held in violation of federal law and invalidated, notwithstanding federalism and separation of powers. Therefore, nothing about the precepts of federalism or the separation-of-powers doctrine precludes the Court from affording the relief it deems appropriate in this case.[6]

---

[6] The Legislature also argues that the Supreme Court has provided powerful reasons for courts to defer to local officials regarding emergency public health matters. In doing so, they liberally quote Chief Justice Roberts. *See FDA v. Am. Coll. of Obstetricians & Gynecologists*, No. 20A34, 2021 WL 99362, at *1 (U.S. Jan. 12, 2021) (Roberts, C.J., concurring) ("[M]y view is that courts owe significant deference to the politically accountable entities with the background, competence, and expertise to assess public health."); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) ("The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."). Those quotes and cases are simply inapposite. As much as the Court respects Chief Justice Roberts, his views alone, as a single member of the Supreme Court, and on situations different from the one at hand, are far from controlling on what this Court must do in this situation, with these laws, and on these facts. In short, the Court does not view this as a situation where requiring compliance with federal law would violate constitutional safeguards of federalism and separation of powers.

### D.  TRO Factors

With those case-dispositive issues determined, the Court turns its attention to the TRO factors. As noted, Plaintiffs have not carried their burden of convincing the Court that there is a likelihood of success on the merits or a likelihood, rather than a mere possibility, of irreparable harm. *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879; *see also Winter*, 555 U.S. at 22 (explaining that issuing preliminary relief "only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). In this section, the Court will explain the reasons for these conclusions.

#### 1.  *Success on the Merits*

The first factor of a TRO involves a showing of a likelihood of success on the merits. It is important to note, however, that granting or denying a motion for a TRO is not an actual adjudication on the merits; rather, it is a preliminary form of relief until the court can reach the merits. *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Ry. Labor Conference*, 310 F. Supp. 904, 905 (D.D.C. 1970).

##### i.  ADA

The ADA prohibits disability discrimination in various contexts. Under Title II, which relates to public services, the ADA specifically states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Public entity" is defined as "any State or local government," 42 U.S.C. § 12131(1)(A), and the Ninth Circuit has held that

ADA Title II claims may be maintained "against state officials in their official capacities." *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1188 (9th Cir. 2003). Under an ADA Title II regulation, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

"The failure to provide [a] reasonable accommodation can constitute discrimination." *Updike v. Multnomah Cty.*, 870 F.3d 939, 951 (9th Cir. 2017) (cleaned up). To succeed on a failure-to-accommodate claim under Title II of the ADA, a plaintiff must show that a public entity failed to make reasonable modifications that would accommodate plaintiff's disability without fundamentally altering the nature of program or activity, and that the accommodation would have enabled the plaintiff to meet the program's essential eligibility requirements. *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1206 (9th Cir. 2016). Importantly, the ADA does not require an accommodation that an individual requests or prefers; instead, the ADA requires only a reasonable accommodation. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002); *see also Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ("As the regulatory language makes clear, entities are required only to make *reasonable* changes in existing policies in order to accommodate individuals' disabilities." (emphasis in

original)).[7] "Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations" sought. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999); *see also Crowder*, 81 F.3d at 1486 ("The determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." (cleaned up)).

In this case, Plaintiffs have not shown a likelihood of success on the merits that their request is a *reasonable* accommodation under Title II of the ADA because they have not shown that the alternative accommodations are unreasonable. Plaintiffs have also not shown that they are being excluded from participation in the legislative session due to the remote participation options. Finally, Plaintiffs have not shown that the Legislature did not engage in a good faith interactive process while trying to remedy their concerns.

To begin, the Legislature has provided numerous measures to mitigate concerns related to COVID-19. For members of the public who wish to attend the Capitol in person, all committee rooms have capacity limits and socially distanced seating; masks are recommended; air purifiers have been installed in all committee rooms, conference rooms, and office spaces; hand sanitizer stations are available throughout the building; overflow rooms will be provided; and committee meetings are held on alternate days to minimize

---

[7] Where the Court cites an employment ADA case in this Order, it notes that "the 'reasonable accommodation' standard of Title I does not differ from the 'reasonable modification' standard of Titles II and III and thus uses the terms 'interchangeably.'" *Smith v. City of Oakland*, No. 19-cv-05398-JST, 2020 WL 2517857, at *8 n.8 (N.D. Cal. Apr. 2, 2020) (quoting *Wong*, 192 F.3d at 816 n.26).

MEMORANDUM DECISION AND ORDER - 18

the number of members in the Capitol. Senate leadership also plans to assess public health protocols and enforcement mechanisms to make appropriate adjustments. The House has adopted similar measures. Further, the Idaho State Department of Administration has updated its rules to better control the use of the Capitol's public spaces to address crowd control. This includes a working agreement with the Boise Police Department to provide assistance.

Even more telling in this case, the Legislature has offered accommodations to members of the public who wish to participate remotely in the legislative process. All committees accept written comments, which can be submitted via email, and all legislators have publicly available email addresses and telephone numbers. The IT personnel of the Legislative Services Office have been working on methods for the public to actively participate remotely in Committee meetings. They have a software application to allow remote participation through a web-based sign-in process that is similar to the process used for in-person participation in Committee meetings. The application is expected to be ready for use by the general public in February. In the meantime, the Legislature has made it known that IT personnel are willing and able to set up remote appearances through Zoom at committee meetings upon request. Members of the public can also watch committee and floor business via a live stream with closed captioning. Through Speaker Bedke's and Pro Tem Winder's efforts, all committee chairs have agreed to allow remote participation through the manual Zoom process if requested, and later through the software application. *See* Dkt. 18, at 24 ("All Committee Chairs have agreed to allow remote participation through either the Zoom process or the software application."); Dkt. 22, at 2 ("Committees

MEMORANDUM DECISION AND ORDER - 19

are prepared to accommodate live remote testimony in an effort to allow full and equal participation to members of the public who do not want to, or are otherwise unable to, give in-person testimony."). These considerations are the most persuasive to the Court in its analysis today.

Simply put, Plaintiffs cannot show that these accommodations are unreasonable under the circumstances. In fact, the very accommodation Plaintiffs seek—remote access and participation—is available. Plaintiffs can hardly say this is unreasonable, which is their burden. *See Larson v. Iboshi*, 441 F. App'x 511, 514 (9th Cir. 2011) (holding that the plaintiff failed to establish alternative accommodations were not reasonable); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001) ("To prevail under the ADA, Duvall must show that the accommodations offered by the County were not reasonable, and that he was unable to participate equally in the proceedings at issue."); *Crowder*, 81 F.3d at 1485 ("Whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constitute reasonable modifications . . . cannot be determined as a matter of law on the record before us."). Similarly, Plaintiffs cannot show that they are being excluded from participation in the legislative session—a necessary element of a Title II claim under the ADA. *See, e.g.*, *Duvall*, 260 F.3d at 1135 ("To prove that a public program or service violated Title II of the ADA, a plaintiff must show [that he or she] was either excluded from participation or denied the benefits of a public entity's services, programs, or activities . . . .").

Additionally, this is a situation that involves issues that are presently ongoing. The interactive process began in mid-December when Plaintiffs sent a letter to the Legislature

requesting accommodations for the legislative session. When Plaintiffs first brought their concerns to Speaker Bedke and Pro Tem Winder (after the House and Senate Rules were adopted), Speaker Bedke and Pro Tem Winder considered the concerns and responded via letters in which they laid out the many health and safety protocols that were being implemented. Then, a week before filing this lawsuit, Plaintiffs sent a follow-up letter requesting additional accommodations. Before Speaker Bedke and Pro Tem Winder could finalize their response and continue the interactive process, Plaintiffs filed this lawsuit. It appears that Speaker Bedke and Pro Tem Winder have continued to consider Plaintiffs' proposals and have taken further action to address Plaintiffs' concerns. Importantly here, they have increased the accessibility of remote participation in the legislative process. Thus, the Legislature has shown that it has communicated in good faith with Plaintiffs, has considered their requests and individual situations, and is offering seemingly reasonable accommodations. *See Zivkovic*, 302 F.3d at 1089 ("The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective."); *see also Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (discussing the interactive process in the context of claims under Title II of the ADA and the Rehabilitation Act).

Nevertheless, Plaintiffs maintain that these accommodations are not enough. They assert that the Legislature's accommodations are "effectively a barrier to participation in the legislative process for people with disabilities." Dkt. 20, at 6. But, in light of these accommodations, any perceived barrier is brought on by COVID-19 and/or Plaintiffs'

choice *not* to avail themselves of the accommodations provided, not the Legislature. Plaintiffs point out that many of the in-person protective measures are optional. However, that does not address Plaintiffs' remote-access options.

Plaintiffs also say that the legislative committees have already informed them that they do not plan to offer a remote participation option. But this ignores the option for email and the option to make a specific request for virtual access. Also, that information appears outdated as it is from earlier on in the interactive process. Indeed, it comes from information preceding the Legislature's filed Response in this case. *See* Dkt. 20, at 7. Plaintiffs also say that they have requested remote participation, via their January 4 letter, and that the Legislature has not provided it. But again, that request was during the interactive process, before the Legislature responded, and before its Response which outlines that any specific request will be approved, and everyone in the general public will have this option in February (without even needing to make an individualized request). Once more, Plaintiffs can hardly complain about receiving the accommodation they sought. It appears that they should simply request remote access to the parts of the legislative session in which they would like to participate and utilize emails.[8]

In short, Plaintiffs have not met their burden of showing a likelihood of success on the merits because they have not shown that the Legislature has acted unreasonably in the

---

[8] All this aside, Plaintiffs still complain that, even if remote access is granted, "it may not be equitable without assurances that it will be given the same weight as in-person testimony." Dkt. 20, at 8. This seems like an odd request since doing so is one of their requested accommodations. The Court will not order the Legislature (either collectively or individually) to somehow represent what their state of mind will be when (Continued)

accommodations provided. The Court is skeptical that these circumstances present a violation of Plaintiffs' rights under the ADA since they appear not to be excluded from participation in the legislative session.

## ii. Rehabilitation Act

The Rehabilitation Act similarly prohibits the exclusion of an "otherwise qualified individual with a disability, . . . solely by reason of her or his disability," from "participation in . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Legislature suggests that the Rehabilitation Act does not apply. Plaintiffs counter that it does because the Legislature recently received $1,256,134.00 in federal funds under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020). These funds were requested "for Statehouse audio/visual improvements and related technology upgrades to provide for remote and social distancing legislative work" during the pandemic. Dkt. 2, at 19. As Speaker Bedke explained, the funds were "critical to help ensure the Legislature has the necessary technology in place to revise how it conducts its business during this pandemic," and "[m]ost, if not all, of the upgrades will be utilized during the 2021 legislative session." *Id.* at 19–20.

Although the Legislature admits that it urged Governor Little to award the Legislature these funds, it argues that the Rehabilitation Act does not apply because it did

---

hearing various forms of testimony because such an order seems unreasonable, impractical, and an overreach into their legislative discretion. Plus, the Legislature has made such a representation on its own initiative. *See* Dkt. 22, at 3 ("I also want to be clear, testimony given during Committee Meetings through remote means is afforded the same weight as in-person testimony.").

not play "a role in appropriating or spending the funds." However, that is not what the statute and caselaw require. The Rehabilitation Act says nothing about how much an entity is involved in the decision of receiving the funds. Instead, the plain language focuses on the receipt of funds. 29 U.S.C. § 794(a) ("receiving Federal financial assistance"); *Zimmerman v. Oregon DOJ*, 170 F.3d 1169, 1181 (9th Cir. 1999) ("The focus of the emphasized phrase in § 504 of the Rehabilitation Act is the receipt of Federal financial assistance." (citing *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 635–37 (1984))).

The Legislature cannot dispute that it received federal funds; indeed, it admits as much. What's more, the Legislature didn't merely request funds, it requested funds for the subject matter of this very lawsuit: to update technology for remote participation during the 2021 legislative session. Therefore, the Legislature's argument is meritless, and the Rehabilitation Act applies. That said, Plaintiffs have not shown a likelihood of success on the merits for the same reasons as the ADA explanation above. *See, e.g.*, *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) ("Congress has instructed that the ADA is to be interpreted consistently with the Rehabilitation Act."); *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996) (explaining that the same tests apply to Rehabilitation Act claims as ADA claims); *cf.* 29 U.S.C. § 794(d).

### iii.   Right to Petition

Plaintiffs cannot show a likelihood of success on the merits with respect to their claim under the Petition Clause because they simply are not restricted from petitioning. The First Amendment to the United States Constitution protects individuals' right "to petition the Government for a redress of grievances." U.S. Const. amend. I; *see also De*

MEMORANDUM DECISION AND ORDER - 24

*Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (incorporating the right to petition through the Fourteenth Amendment). This guarantee is "one of the most precious of the liberties safeguarded by the Bill of Rights," *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002) (cleaned up), and is rooted in principles that "long antedate the Constitution," *McDonald v. Smith*, 472 U.S. 479, 482 (1985). Like other rights, however, the right to petition is not absolute. *Id.* at 484. It is axiomatic that the right to petition is not violated when a party can in fact petition.

In this case, the Court's inquiry swiftly ends because Plaintiffs can in fact engage in the legislative session as explained above. The Legislature is not restricting access to the legislative session. Rather, for all intents and purposes, the Legislature appears to be working toward providing as much access as possible to Plaintiffs. And to the extent that Plaintiffs are restricted from petitioning the Legislature, such a restriction is not state-imposed but is an effect of the challenging circumstances of COVID-19. Indeed, the Legislature has taken the noted affirmative steps to protect people from COVID-19 during the legislative session. Plaintiffs' arguments to the contrary are unpersuasive because they do not square with the facts of this case, particularly the remote-participation accommodations that are being made for them and for others who feel they cannot attend the legislative session in person. Therefore, no scrutiny is in order.

### 2. *Irreparable Harm*

The next factor of a TRO analysis requires a showing that irreparable harm is likely to occur in the absence of the requested relief. As Plaintiffs themselves point out, public testimony has not been taken yet. Dkt. 20, at 8. Thus, a harm has yet to occur. Moreover,

harm is unlikely to occur because Plaintiffs can simply request to participate remotely, and their request will be approved. In the imminent meantime, while the requests are being processed, they can observe the session via closed captioning videos provided and send emails to legislators. It appears the ball is in Plaintiffs' court to re-engage in the interactive process and request access to participate in the legislative session. Based on the accommodations being provided, Plaintiffs have not carried their burden of showing that they are likely to suffer irreparable harm.

## IV. CONCLUSION

The Court is aware of the third and fourth factors of a TRO analysis as it plainly noted them above. It does not address those factors, however, because Plaintiffs have not made an adequate showing on the first two factors of the TRO standard. Simply put, the Court does not deem it a sound use of its discretion to grant a TRO under these circumstances. It will, therefore, deny the motion and allow the case to proceed in a normal fashion. Of course, Plaintiffs may ultimately succeed on their claims, especially if they do not receive remote access to the legislative session—although such would be contrary to what the Legislature has represented to the Court. At this juncture, however, a TRO is unwarranted.

///

///

///

///

///

///

## V. ORDER

**IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for a Temporary Restraining Order (Dkt. 2) is **DENIED**.

DATED: January 22, 2021

David C. Nye
Chief U.S. District Court Judge